1  COURTNEY STUART-ALBAN (SBN 225513)
2  JUAN PABLO ALBAN (SBN 218144)
   STUART ALBAN LAW, PC
3  87 Raymond Avenue, Suite 200
4  Pasadena, CA 91103
   Telephone: (323) 208-4596
5  courtney@stuartalbanlaw.com
6  jp@stuartalbanlaw.com

7  Attorneys for Plaintiff
8  Lisbeth W. Roy

9

10

11                 NORTHERN DISTRICT OF CALIFORNIA

                        SAN FRANCISCO
12

13
   DR. LISBETH W. ROY, an            Case No. 3:23-cv-4764
14 individual, on behalf of herself and
15 the general public,               [Assigned to Hon. _____]

16              Plaintiff,           **COMPLAINT FOR**

17        v.                         **1. VIOLATION OF BUSINESS &**
                                     **PROFESSIONS CODE § 17200**
18 SALESFORCE, INC., a Delaware      **(VIOLATION OF CC § 1511)**
19 corporation, and DOES 1-5,
                                     **2. VIOLATION OF BUSINESS &**
20              Defendants.          **PROFESSIONS CODE § 17200**
                                     **(VIOLATION OF CC § 1671)**
21
22                                   **3. VIOLATION OF BUSINESS &**
                                     **PROFESSIONS CODE § 17200**
23                                   **(VIOLATION OF CC § 1670.5)**
24

25

26

27

28
                              1.

Plaintiff DR. LISBETH W. ROY alleges as follows:

## I.    INTRODUCTION

1.    This case presents the Court with a meaningful opportunity to "police" an unlawful adhesion contract that the tech-tycoon defendant Salesforce, Inc. ("Salesforce") drafted and unfairly enforces against customers. Among other violations of California law, Plaintiff alleges that Defendant's contract is unconscionable and unenforceable as a matter of law under Cal. Civ. Code ("CC") 1670.5.  *See* Notes to CC 1670.5 ("Section 1670.5 is intended to make it possible for the courts to police explicitly against the contracts or clauses which they find to be unconscionable.").

2.    Salesforce used its vast resources and aggressive sales tactics to sell an expensive subscription contract for software as a service (or "SaaS") to Plaintiff, an individual doctor.  Salesforce offered its subscription services ("Subscription services") to Plaintiff through its standard-form Master Subscription Agreement ("MSA"), a contract of adhesion that Salesforce drafted and offered to Plaintiff on a take-it-or-leave it basis.

3.    Soon after, Plaintiff discovered that the contract amount she had agreed to pay was not the "true cost" of the Salesforce software because, in order to use the software *at all*, everyone who contracts with Salesforce is required to spend additional sums to "implement" the software ("Implementation Cost(s)"). Salesforce "implementation services" are offered outside of the MSA for payment of additional fees.  The true cost ("True Cost") of the Salesforce Subscription service is therefore the Implementation Cost plus the Subscription cost.

4.    The Salesforce contract does not disclose that the Salesforce Subscription requires payment of significant Implementation Costs for the subscription to hold any value to the consumer.

5.    In March 2020, COVID-19 hit the United States and was declared a

global pandemic. Businesses were shuttered across the country, and the purpose for which plaintiff had contracted with Salesforce – business growth through new customer acquisitions and other customer relationship management (or "CRM") functions – was totally destroyed.

6.     Once Plaintiff learned the True Cost of the Salesforce subscription, *i.e.*, the contract amount cost plus the Implementation Costs, she notified Salesforce that, *inter alia*, the contract's purpose had been frustrated by Covid, a *force majeure* event not addressed in the MSA, and Plaintiff needed to terminate her subscription agreement with Salesforce.

7.     In response, Salesforce insisted that the Salesforce Contract required Plaintiff to pay Salesforce's "Termination Penalty" – *i.e.* the **full value** of the contract with no reduction whatsoever for any costs saved by Salesforce – even though Plaintiff (like so many other Salesforce customers) was unable to make *any* use of the Subscription services and thus Salesforce was saving all of the costs it would have incurred to "service" Plaintiff's contract.  Regardless of the circumstances leading a customer to want to terminate their Subscription, Plaintiff and other Salesforce customers are not given a rational choice for termination and Salesforce relieves itself of any duty whatsoever to mitigate its damages from an early termination.  Rather, the Salesforce MSA penalizes customers who want to terminate their contracts and who stop making monthly payments for Subscription services they are unable to use, including by accelerating the due date of the contract and charging arbitrary interest.

8.     Plaintiff attempted to negotiate with Salesforce, pleading that – if nothing else, the circumstances of Covid-19 justified Plaintiff's cancellation of the Contract under California's default *force majeure* statute (since there was no *force majeure* clause in Salesforce's Contract).  Notwithstanding Plaintiff's and her attorney's efforts, Salesforce strictly enforced its Termination Penalty, ultimately

threatening to report Plaintiff to a credit agency if she did not pay the entire Termination Penalty amount.  Plaintiff eventually capitulated to avoid a downgrading of her credit score.  Salesforce, therefore, after concealing the True Cost of its adhesion contract, received the full benefit of the contract while providing nothing of value to Plaintiff.  Indeed, the Salesforce business model appears to be centered around the use of aggressive sales tactics to sell expensive software Subscriptions without disclosing the True Cost of the services.  Thereafter, Salesforce profits further from the sale of Implementation services, a separate source of revenue for Salesforce.

9. Alternatively, if the customer is unable or unwilling to pay the Implementation Costs, as was the case with Plaintiff, Salesforce benefits from a windfall amount greater than its expectation damages because it forces payment of the Termination Penalty with no deduction for any costs saved by Salesforce.

10. The Termination Penalties that Salesforce customers are required to pay in the event of early termination of their contract generate substantial revenues and profits for Salesforce, but pose grave financial danger to Salesforce customers and California consumers.

11. Now, more than three years later, with Covid in the rearview mirror, Plaintiff is better positioned to utilize Salesforce's software services to grow her business, and she would like to use Salesforce's ubiquitous CRM platform for various reasons. However, Plaintiff is understandably wary of entering into a contract with Salesforce with no understanding of the expected Implementation Costs and without any recourse if she is unable to implement the software at all, as she has read on the internet has occurred with other Salesforce customers.

12. Plaintiff hereby files this Complaint on behalf of herself and the general public alleging that the MSA's Termination Penalty and its related clauses are void and unenforceable under California Civil Code section 1671; that the MSA

4.

is unconscionable under Civil Code Section 1670.5; that Plaintiff's MSA's purpose was frustrated and the MSA thus terminated pursuant to California Civil Code section 1511; and that the MSA and Defendants' practices are unlawful and/or unfair under California's Unfair Competition Law, Business & Professions Code section 17200, et seq. ("UCL").

13.    California has a legacy of protecting consumers and small business owners from unfair practices that threaten their financial ruin.  This court has the responsibility to police Salesforce by holding it accountable to the standards of fairness and transparency required of companies operating under California law.

## II.    THE PARTIES

### A.    **Plaintiff Dr. Lisebth W. Roy**

14.    Plaintiff Dr. Lisbeth W. Roy, D.O., PA is an individual, with medical practice offices located at 2595 NW Boulevard, Suite 200, Boca Raton, FL 33431.

15.    At all relevant times, Plaintiff was doing business as a sole proprietor Doctor's Studio, a Florida fictitious business name formerly owned by Plaintiff.

16.    Plaintiff brings this Complaint on behalf of herself and the general public, seeking injunctive relief that would benefit a large class of persons doing business in the state of California.

### B.    **Defendant Salesforce**

17.    Defendant Salesforce, Inc. is a Delaware Corporation, registered to do business in California, with its principal place of business at 415 Mission Street, San Francisco, California 94105.

18.    Salesforce is a publicly-traded mega-cap corporation that primarily offers cloud technology-based SaaS for "customer relationship management" ("CRM"). Salesforce describes itself as a global leader in CRM technology.

Salesforce's most recent fiscal year (February 1, 2022 – January 31, 2023) resulted in revenue of $31.352 billion, up 18 percent year over year.

### III.   JURISDICTION AND VENUE

19.      This Court has diversity subject-matter jurisdiction over this action pursuant to 28 U.S. Code § 1332.  The citizenship of the only plaintiff (Florida) is diverse from the citizenship of the only defendant (California).  The amount in controversy is above the requisite $75,000, including the cost of injunctive and restitutionary relief.  Plaintiff also seeks her attorneys' fees.

20.      This Court has personal jurisdiction over Defendant because Salesforce is headquartered in California, and its MSA contains a forum selection clause that designates California as its jurisdictional forum.

21.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District. Venue is also proper because Salesforce's terms of service require that claims are resolved in the courts located in San Francisco, California.

22.      The true names and capacities, whether individual, corporate, associate or otherwise of defendant DOES 1 through 5 are unknown to the Plaintiff, and therefore Plaintiff sues defendants under fictitious names.  Plaintiff is informed and believes and therefore alleges that each of the DOE defendants may be responsible for the claims alleged and the damages incurred by Plaintiff.  Plaintiff will amend its complaint to designate the identity of the parties sued as DOE when they are ascertained.

23.      Plaintiff is informed and believes and based thereon alleges that, at all times herein mentioned, each of the defendants was acting as an agent and/or servant and/or employee and/or representative of his or her co-defendants, and, in doing the things alleged, was acting within the course and scope of such agency,

service, employment, representation and with the permission and consent of the other defendants.

## IV.   FACTUAL ALLEGATIONS

A.   **Salesforce Conceals the True Cost of the MSA to Induce Prospective Customers to Sign Subscription Agreements with Unconscionable Terms.**

24.     Salesforce is a cloud technology SaaS company that specializes in CRM.

25.     Salesforce describes itself as a global leader in CRM technology. Using CRM as its ticker symbol, Salesforce's common stock trades publicly with a market capitalization of over $200 billion as of this filing, making Salesforce one of less than forty "mega-cap" corporations traded on U.S. public markets.

26.      Upon information and belief, Salesforce sells its Subscription services primarily through a direct sales force, which comprises telephone sales personnel based in regional hubs and field sales personnel based in territories close to their customers. Both its telephone sales and field sales personnel are supported by sales representatives who are primarily responsible for generating qualified sales leads (collectively Salesforce's "Sales Agents").

27.     Upon information and belief, Salesforce and its Sales Agents are aware that prospective customers are contracting for Subscription services that will require an additional significant investment of Implementation Costs to hold any value.

28.     Plaintiff alleges that Salesforce sold Plaintiff Subscription services while knowing but not disclosing that those services would require a significant additional investment above-and-beyond the cost of the Subscription services represented by Salesforce.

29.     Plaintiff alleges that Salesforce routinely and purposefully conceals the True Cost of the Subscription benefits that Salesforce promotes and promises and

COMPLAINT

the customer expects to receive ("Expected Benefits") in order to induce members of the public to purchase expensive Subscriptions they otherwise might not agree to purchase.

30.     Plaintiff alleges that by the time she discovered the True Cost of the Expected Benefits, she had already signed the MSA with its unconscionable Termination Penalty, though she would not have signed the MSA if she had been aware of the True Costs.  Plaintiff further alleges that Salesforce's unconscionable contracts and unfair business practices are intentionally designed to extract an unfair financial advantage from unsuspecting consumers, as occurred with Plaintiff.

31.     Plaintiff is asking this Court, on behalf of herself and the public at large, to protect Plaintiff and other unsuspecting consumers from Salesforce's unfair business practices, by reviewing and "policing" the Salesforce MSA to ensure that it complies with applicable California law and policy, as the California legislature intended.

B.     **Plaintiff's Experience**

32.     Doctor's Studio at all relevant times was a medical clinic and wellness center providing elective services for longevity and regenerative health.

33.     Plaintiff operated and solely owned Doctor's Studio.

34.     Dr. Roy achieved her Doctor of Osteopathic Medicine degree at the University of New England College of Osteopathic Medicine.  Dr. Roy is Board Certified in Anti-Aging, Functional and Corrective Medicine and an active member of the American Academy of Anti-Aging Medicine (A4M), Institute of Functional Medicine (IFM), Sexual Medicine Society of North America (SMSNA), and International Society for the Study of Women's Sexual Health.

35.     Before the pandemic, Plaintiff's practice was a small but growing business.

C.    **Terms of the MSA**

36.    On or about December 23, 2019, Plaintiff entered into the MSA with Salesforce.

37.    Defendant had superior bargaining power and drafted the MSA.

38.    The MSA is an adhesion contract that Salesforce presented to Plaintiff on a standardized, preprinted form, on a take-it-or-leave-it basis.

39.    Plaintiff was not afforded an opportunity to negotiate the terms, and she did not negotiate the terms, of the MSA.

40.    Plaintiff did not have attorney representation when entering into the MSA.

41.    The MSA contains terms that are unreasonably favorable to Salesforce, the more powerful party.

42.    The MSA contains harsh one-sided terms that favor Salesforce to the detriment of Plaintiff and other customers.

43.    The MSA does not present a rational choice of cancellation or breach. The MSA states on its face states that  payment obligations are "non-cancelable". MSA at §5.1.

44.    The MSA provides that if a customer tries to terminate the MSA early, for example by stopping monthly payments, they will be forced to pay *more* than the total amount due under the contract, and the entire amount will become due on an accelerated basis.  MSA at §5.4.

45.    If a periodic payment is not received by the due date, Salesforce retains the right to impose an arbitrary 1.5% interest penalty for the late amounts. MSA at §5.3.

46.    The MSA requires customers to pay the full term amount of their contracts whether they are able to implement the Subscription services, or not. MSA at §§ 5.1, 5.4.

47.     There is no indication in the MSA that Salesforce made any effort to estimate what its actual damages would be in the event of Plaintiff's desire to terminate their Subscription services early, with the adhesion contract instead imposing a severe and arbitrary penalty.

48.     The MSA's penalty for a customer's breach or termination is the same regardless of the circumstances or timing. There is no relationship between the penalty and the range of harm to Salesforce that could reasonably be anticipated at the time the parties entered into the contract. Salesforce assumes and enforces no duty to mitigate any damages it may incur from early terminations.

49.     Furthermore, under the MSA, fees are based on "subscriptions purchased" from Salesforce's aggressive Sales Agents, "not on actual usage" of Salesforce's Subscription services. MSA at § 5.1(i).

50.     On the one hand, the Salesforce MSA purports to inoculate Salesforce from any claims that *customers* are entitled to receive a *downward* adjustment of costs based on little or no usage.

51.     On the other hand, if Customers use one iota *more* data than the contracted amount, the fees *are* based on "the actual usage" of the Subscription services, such that any *upward* adjustment of usage results in "overage fees" charged at a penalty premium. MSA at § 3.2.

52.      Salesforce markets their software products as a way for business owners to "increase productivity" and "grow" their businesses.

53.     When Plaintiff entered into the MSA in December 2019, Plaintiff made the investment for the purpose of accommodating the pace of growth she had created over the preceding years.

54.     In December 2019, Plaintiff had a reasonable belief that her business would continue to grow at the same, or an even faster, pace in the coming months and years, as has been the case in the preceding years.

55.     Plaintiff soon discovered, however, that the Expected Benefits of the MSA were contingent upon a significant additional investment of Implementation Costs, which Plaintiff alleges Salesforce knew or should have known would be necessary, but which Salesforce did not disclose.

56.     Indeed, Plaintiff was surprised to learn that it would cost approximately $12,000 in hidden Implementation Costs to receive any of the Expected Benefits of the MSA.

57.     The Salesforce Subscription services had zero value to Plaintiff without payment of the undisclosed Implementation Costs.

58.     Plaintiff would not have agreed to enter into the MSA if Salesforce had disclosed that she would also need to incur the Implementation Costs.

59.     Upon information and belief, Salesforce intentionally concealed the Implementation Costs to induce Plaintiff to enter into the MSA.

60.     Just over two months into the contract term, COVID-19 was declared a global pandemic and businesses across the nation, including Plaintiff's, were forced to shutter.

61.      As a result of COVID-19, Plaintiff's business was affected by a range of external factors that were not within Plaintiff's control.  As Salesforce explained in its SEC filings, authorities throughout the world implemented numerous preventative measures to contain or mitigate further spread of the virus, such as travel bans and restrictions, limitations on business activity, quarantines, work-from-home directives and shelter-in-place orders. These public health measures and people's reactions to them and to the COVID-19 pandemic in general, caused business slowdowns or shutdowns regionally and worldwide.

62.     Plaintiff's medical practice, where patients go in-person for elective health and wellness procedures, was particularly affected by COVID-19 due to the in-person and elective nature of its services.  The COVID-19 pandemic brought to a

halt Plaintiff's marketing and growth implementation to a standstill, with customers avoiding elective medicine services; and zero prospects for business growth through new customer acquisitions or other CRM services.

63.    At this time, Plaintiff had not yet been able to pay the Implementation Costs, and thus had not used, and in fact, never did use, any of the Subscription services.

64.    On May 24, 2020, Dr. Roy notified Salesforce that she wanted to cancel her Salesforce subscription, citing the legal justification: "frustration of purpose."

65.    Specifically, on May 24, 2020, Dr. Roy emailed three separate Salesforce agents the following:

> *I am writing to request a termination of contract due to "Frustration of Purpose" during the current pandemic. As I am sure you are aware, I am not running my business as usual. As a result, I will not be able to continue making any further payments.*

66.    On May 26, 2020, a Salesforce representative responded: "*Hello Dr. Roy - I am sorry to hear you are suffering during this time. Is there anything we can do to help you? We want to make sure you are set up for success when things open back up. Let us know!*"

67.    On June 1, 2020, Dr. Roy replied with the following message: "*Thank you. I appreciate the offer. I would like my salesforce contract terminated and all current subscriptions to Salesforce products cancelled. I will not be re-opening as business as usual anytime soon.*"

68.    Shortly thereafter that same day, the representative responded, "*No problem. Take care and good luck!*"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

69.     On June 20, 2020, after receiving another Salesforce invoice, Dr. Roy emailed her Salesforce representative again asking him to "*please send [her] a document stating that [her] account is cancelled and that there is a zero balance*."

70.     Later that same day, the Salesforce representative responded as follows: "*Hello Dr. Roy - Your current contract is expiring on 12/22. I have gone ahead and cancelled the upcoming renewal to make sure it terminates on 12/22. Is your request below to cancel the current agreement in place, and no longer make payments? I can submit the request for this, but in full transparency **I have had significant difficulty cancelling any existing contracts that are in place***." (Emphasis added)

71.     Salesforce refused to cancel Plaintiff's Subscription despite the fact that Plaintiff no longer had any use for the Subscription services due to her inability to provide in-persona medical services, much less grow her business, as a result of the unforeseeable global pandemic.

72.     On September 27, 2020, Plaintiff's counsel sent a Litigation Hold and Demand Letter explaining the circumstances and citing California Civil Code Section 1511, which excuses performance for a force majeure.

73.     On October 8, 2020, Salesforce's counsel, George Yu, responded to Plaintiff's letter and rejected Plaintiff's termination request.

74.     On December 1, 2020, Ms. Stuart-Alban responded to Mr. Yu's letter by email, noting that Mr. Yu's letter did "not address the issue of Salesforce's unreasonable punitive damages clause, which accelerates all amounts due and requires complete payment of the contract, regardless of Salesforce's actual damages."

75.     Plaintiff later received a follow-up notice about her delinquent account, requesting immediate payment.

76.     After that, Plaintiff received a notice from a collections agency stating that it was seeking payment for the remainder of the balance due.

77.     Plaintiff seeks equitable relief, including injunctive relief, because there is no adequate remedy at law here.  Pecuniary compensation will not afford adequate relief to Plaintiff, or to the public on her representative claims, where Plaintiff alleges and seeks a ruling that Salesforce's contract is unconscionable and unlawful under California law.  Salesforce is the undisputed leader in market share for CRM management and Plaintiff has an interest in using their services now and in the future and accordingly is entitled under the laws of California to require that Salesforce's contracts meet the standards of transparency and fair dealing required of all businesses based in California.

# FIRST CAUSE OF ACTION

## (Violation of Business & Professions Code § 17200—CC 1511)

78.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though set out at length herein.

79.     Defendants enter into contracts with multiple businesses including Plaintiff's to "increase productivity" and "grow" the business through CRM.  Both Defendant and Plaintiff contemplated this purpose when entering into the MSA.

80.     No parties to the MSA foresaw or could reasonably foresee the onset of the COVID-19 pandemic, including Defendant and Plaintiff when they entered into the MSA.

81.     The purpose of Defendant's services under the MSA was totally or nearly totally destroyed for certain businesses, including Plaintiff's, that were forced to shutter and/or had zero use for marketing or growth-oriented CRM services due to the COVID-19 pandemic. Because of the pandemic, Plaintiff's

elective medicine business suddenly had zero marketing, growth execution or other CRM service uses during the remaining term of the MSA.

82.     California Civil Code 1511 excuses non-performance under a contract when there is an "irresistible and superhuman cause" that frustrates the purpose of the contract, unless the parties have agreed otherwise.

83.     COVID-19 is an "irresistible and superhuman cause" because it could not have been prevented by the exercise of prudence, diligence, and care.

84.     On information and belief, Defendants had and has a business practice of failing to cancel contracts in place whose purpose is totally or nearly totally destroyed because of irresistible and superhuman causes such as the COVID-19 pandemic.

85.     This is an unfair business practice that affected many in-person businesses who were unable to "grow" their closed businesses during the pandemic.

86.     Plaintiff suffered injury in fact as damages in an amount equal to the balance due on her MSA agreement from her cancellation in May 2020, to the termination of the contract in December 2022.

## SECOND CAUSE OF ACTION

### (Violation of Business & Professions Code § 17200—CC 1671

87.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though set out at length herein.

88.     The policy embedded in CC 1671, including the policy of shifting the burden of proof to the proponent of the liquidated damages clause is fundamental California policy.

89.     The MSA agreement contains a provision where the full amount of the contract becomes due if a payment is missed, plus interest, no matter what the circumstances or cost to Salesforce, without a reasonable choice for the customer.

90.     This provision was unreasonable when the contract was made, including among other factors because it bears no reasonable relationship to the actual damages suffered by Salesforce, the MSA is a form contract of adhesion offered to customers including Plaintiff on a take-it-or-leave it basis, Salesforce is a mega-cap corporation with superior bargaining power over its small business customers including Plaintiff, there was no effort by the parties to estimate actual damages to Saleforce from early termination by customers, and Plaintiff did not have attorney representation.

91.     This provision is thus void as an unlawful penalty.

92.     Plaintiff suffered injury in fact as damages in an amount equal to the balance due on her MSA agreement from her cancellation in May 2020, to the termination of the contract in December 2022.

## THIRD CAUSE OF ACTION

### (Violation of Business & Professions Code § 17200—CC 1670.5)

93.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though set out at length herein.

94.     Defendants concealed Implementation Costs when using high pressure sales tactics with customers prior to entering into MSAs.

95.     The MSA omits disclosure that the Expected Benefits of the Subscription services will require Implementation Costs.

96.     Without the Implementation Costs, under the one-sided and unjustified terms of the MSA, the Subscription services will have no value and Salesforce *has to provide no services* but yet receive full payment on an accelerated basis plus interest under a non-cancelable contract. (*See*, *e.g.*, MSA at §§ 5.1(ii), 5.3, 5.4)

97.     Plaintiff was surprised to learn of the hidden Implementation Costs after entering into the MSA, by which time she had no meaningful choice under the MSA's oppressive take-it-or-leave-it terms but to pay the full price of the MSA in

exchange for no services and no matter what the cost to Salesforce of early termination.

98.    Defendants also continued to invoice on contracts whose purpose was completely or almost completely destroyed by the COVID-19 pandemic, rendering Salesforce (again) able to collect full payment, including through collections agents pursuing Plaintiff, an individual, but provide no services and irrespective of its own costs from any early termination.

99.    Defendants received the full benefit of the contract but Plaintiff and similarly situated businesses did not receive any of the benefits of the contract.

100.    Defendants have been unjustly enriched by their refusal to cancel contracts worthless to customers, often from inception.

101.    As a direct and proximate result of Defendant's actions, Plaintiff has been damaged in an amount equal to the balance due on her MSA agreement from her cancellation in May 2020, to the termination of the contract in December 2022; and to the entirety of the MSA fees she paid to Salesforce due to Defendants' concealment of the Implementation Costs, disclosure of which would have compelled Plaintiff not to enter into the MSA.

**WHEREFORE**, Plaintiff prays for judgment against Defendants in the cumulative or in the alternative as follows:

1.  A Declaration including pursuant to Cal. Code of Civ Proc. Section 1060, that the Salesforce MSA is unconscionable to the extent that it fails to disclose the existence of Implementation Costs while forcing full-term payment as a Termination Penalty under circumstances where Salesforce provides no services;

2.  A Declaration, including pursuant to Cal. Code of Civ. Proc. Section 1060, that the Salesforce Termination Penalty was unreasonable under the

17.

circumstances existing at the time the contract was made and as such constitutes an unlawful penalty under California Civil Code §1671.

3.  A Declaration that the Salesforce MSA is unconscionable, , specifically as to Sections 5.1(i), 5.1(ii), 5.3(a), 5.4,  and therefore unenforceable, at least with respect to those provisions, under California Civil Code §1670.5;

4.  Prospective injunctive relief requiring Salesforce to disclose the existence of Implementation Costs for the purpose of restraining future violations of law both for the benefit of Plaintiff and for the benefit of the general public;

5.  Prospective injunctive relief for the purpose of restraining future violations of law for the benefit of Plaintiff, and for the benefit of the general public, requiring Salesforce contracts to provide consumers with a rational choice for early termination;

6.  In addition, and or in the alternative, a Declaration that Plaintiff's Salesforce MSA was terminated under California Civil Code §1511 where Plaintiff entered into the MSA with Salesforce for the purpose of customer growth or management, which purpose was destroyed after the onset of the COVID-19 pandemic.

7.  Restitutionary disgorgement under Business & Professions Code §17200 et seq. of any and all amounts Plaintiff paid to Salesforce in an amount to be decided by the Court at trial;

8.  Attorneys' fees under California Code of Civil Procedure §1021.5.

9.  For such other and further relief as the court deems proper.


Dated:  September 15, 2023                    STUART ALBAN LAW, PC

                                             By: _____
                                             Juan Pablo Alban
                                             Courtney Stuart-Alban
                                             Attorneys for Plaintiff Dr. Lisbeth W. Roy

18.

EXHIBIT A



## MASTER SUBSCRIPTION AGREEMENT

THIS MASTER SUBSCRIPTION AGREEMENT GOVERNS CUSTOMER'S ACQUISITION AND USE OF SFDC SERVICES. CAPITALIZED TERMS HAVE THE DEFINITIONS SET FORTH HEREIN.

IF CUSTOMER REGISTERS FOR A FREE TRIAL OF SFDC SERVICES OR FOR FREE SERVICES, THE APPLICABLE PROVISIONS OF THIS AGREEMENT WILL ALSO GOVERN THAT FREE TRIAL OR THOSE FREE SERVICES.

BY ACCEPTING THIS AGREEMENT, BY (1) CLICKING A BOX INDICATING ACCEPTANCE, (2) EXECUTING AN ORDER FORM THAT REFERENCES THIS AGREEMENT, OR (3) USING FREE SERVICES, CUSTOMER AGREES TO THE TERMS OF THIS AGREEMENT. IF THE INDIVIDUAL ACCEPTING THIS AGREEMENT IS ACCEPTING ON BEHALF OF A COMPANY OR OTHER LEGAL ENTITY, SUCH INDIVIDUAL REPRESENTS THAT THEY HAVE THE AUTHORITY TO BIND SUCH ENTITY AND ITS AFFILIATES TO THESE TERMS AND CONDITIONS, IN WHICH CASE THE TERM "CUSTOMER" SHALL REFER TO SUCH ENTITY AND ITS AFFILIATES. IF THE INDIVIDUAL ACCEPTING THIS AGREEMENT DOES NOT HAVE SUCH AUTHORITY, OR DOES NOT AGREE WITH THESE TERMS AND CONDITIONS, SUCH INDIVIDUAL MUST NOT ACCEPT THIS AGREEMENT AND MAY NOT USE THE SERVICES.

The Services may not be accessed for purposes of monitoring their availability, performance or functionality, or for any other benchmarking or competitive purposes.

SFDC's direct competitors are prohibited from accessing the Services, except with SFDC's prior written consent.

This Agreement was last updated on September 1, 2019. It is effective between Customer and SFDC as of the date of Customer's accepting this Agreement.

## 1.    DEFINITIONS

"Affiliate" means any entity that directly or indirectly controls, is controlled by, or is under common control with the subject entity. "Control," for purposes of this definition, means direct or indirect ownership or control of more than 50% of the voting interests of the subject entity.

"Agreement" means this Master Subscription Agreement.

"Beta Services" means SFDC services or functionality that may be made available to Customer to try at its option at no additional charge which is clearly designated as beta, pilot, limited release, developer preview, non-production, evaluation, or by a similar description.

"Content" means information obtained by SFDC from publicly available sources or its third party content providers and made available to Customer through the Services, Beta Services or pursuant to an Order Form, as more fully described in the Documentation.

"Customer" means in the case of an individual accepting this Agreement on his or her own behalf, such individual, or in the case of an individual accepting this Agreement on behalf of a company or other legal entity, the company or other legal entity for which such individual is accepting this Agreement, and Affiliates of that company or entity (for so long as they remain Affiliates) which have entered into Order Forms.

"Customer Data" means electronic data and information submitted by or for Customer to the Services, excluding Content and Non-SFDC Applications.

"Documentation" means the applicable Service's Trust and Compliance documentation at https://trust.salesforce.com/en/trust-and-compliance-documentation/ and its usage guides and policies, as updated from time to time, accessible via help.salesforce.com or login to the applicable Service.

"Free Services" means Services that SFDC makes available to Customer free of charge. Free Services exclude Services offered as a free trial and Purchased Services.

"Malicious Code" means code, files, scripts, agents or programs intended to do harm, including, for example, viruses, worms, time bombs and Trojan horses.

"Marketplace" means an online directory, catalog or marketplace of applications that interoperate with the Services, including, for example, the AppExchange at http://www.salesforce.com/appexchange, or the Heroku add-ons catalog at https://elements.heroku.com/, and any successor websites.

"Non-SFDC Application" means a Web-based, mobile, offline or other software application functionality that interoperates with

a Service, that is provided by Customer or a third party and/or listed on a Marketplace including as Salesforce Labs or under similar designation. Non-SFDC Applications, other than those obtained or provided by Customer, will be identifiable as such.

"Order Form" means an ordering document or online order specifying the Services to be provided hereunder that is entered into between Customer and SFDC or any of their Affiliates, including any addenda and supplements thereto. By entering into an Order Form hereunder, an Affiliate agrees to be bound by the terms of this Agreement as if it were an original party hereto.

"Purchased Services" means Services that Customer or Customer's Affiliate purchases under an Order Form or online purchasing portal, as distinguished from Free Services or those provided pursuant to a free trial.

"Services" means the products and services that are ordered by Customer under an Order Form or online purchasing portal, or provided to Customer free of charge (as applicable) or under a free trial, and made available online by SFDC, including associated SFDC offline or mobile components, as described in the Documentation. "Services" exclude Content and Non-SFDC Applications.

"SFDC" means the salesforce.com company described in the "SFDC Contracting Entity, Notices, Governing Law, and Venue" section below.

"User" means, in the case of an individual accepting these terms on his or her own behalf, such individual, or, in the case of an individual accepting this Agreement on behalf of a company or other legal entity, an individual who is authorized by Customer to use a Service, for whom Customer has purchased a subscription (or in the case of any Services provided by SFDC without charge, for whom a Service has been provisioned), and to whom Customer (or, when applicable, SFDC at Customer's request) has supplied a user identification and password (for Services utilizing authentication). Users may include, for example, employees, consultants, contractors and agents of Customer, and third parties with which Customer transacts business.

## 2.   SFDC RESPONSIBILITIES

**2.1   Provision of Purchased Services.** SFDC will (a) make the Services and Content available to Customer pursuant to this Agreement, and the applicable Order Forms and Documentation, (b) provide applicable SFDC standard support for the Purchased Services to Customer at no additional charge, and/or upgraded support if purchased, (c) use commercially reasonable efforts to make the online Purchased Services available 24 hours a day, 7 days a week, except for: (i) planned downtime (of which SFDC shall give advance electronic notice), and (ii) any unavailability caused by circumstances beyond SFDC's reasonable control, including, for example, an act of God, act of government, flood, fire, earthquake, civil unrest, act of terror, strike or other labor problem (other than one involving SFDC employees), Internet service provider failure or delay, Non-SFDC Application, or denial of service attack, and (d) provide the Services in accordance with laws and government regulations applicable to SFDC's provision of its Services to its customers generally (i.e., without regard for Customer's particular use of the Services), and subject to Customer's use of the Services in accordance with this Agreement, the Documentation and the applicable Order Form.

**2.2   Protection of Customer Data.** SFDC will maintain appropriate administrative, physical, and technical safeguards for protection of the security, confidentiality and integrity of Customer Data, as described in the Documentation. Those safeguards will include, but will not be limited to, measures designed to prevent unauthorized access to or disclosure of Customer Data (other than by Customer or Users). Except with respect to a free trial, the terms of the data processing addendum at https://www.salesforce.com/company/legal/agreements.jsp ("DPA") are hereby incorporated by reference and shall apply to the extent Customer Data includes Personal Data, as defined in the DPA. To the extent Personal Data from the European Economic Area (EEA), the United Kingdom and Switzerland are processed by SFDC, its Processor Binding Corporate Rules, the EU-US and/or Swiss-US Privacy Shield, and/or the Standard Contractual Clauses shall apply, as further set forth in the DPA. For the purposes of the Standard Contractual Clauses, Customer and its applicable Affiliates are each the data exporter, and Customer's acceptance of this Agreement, and an applicable Affiliate's execution of an Order Form, shall be treated as its execution of the Standard Contractual Clauses and Appendices. Upon request by Customer made within 30 days after the effective date of termination or expiration of this Agreement, SFDC will make Customer Data available to Customer for export or download as provided in the Documentation. After such 30-day period, SFDC will have no obligation to maintain or provide any Customer Data, and as provided in the Documentation will thereafter delete or destroy all copies of Customer Data in its systems or otherwise in its possession or control, unless legally prohibited.

**2.3   SFDC Personnel.** SFDC will be responsible for the performance of its personnel (including its employees and contractors) and their compliance with SFDC's obligations under this Agreement, except as otherwise specified in this Agreement.

**2.4   Beta Services.** From time to time, SFDC may make Beta Services available to Customer at no charge. Customer may choose to try such Beta Services or not in its sole discretion. Any use of Beta Services is subject to the Beta Services terms at https://www.salesforce.com/company/legal/agreements.jsp.

**2.5   Free Trial.** If Customer registers on SFDC's or an Affiliate's website for a free trial, SFDC will make the applicable Service(s) available to Customer on a trial basis free of charge until the earlier of (a) the end of the free trial period for which Customer registered to use the applicable Service(s), or (b) the start date of any Purchased Service subscriptions ordered by Customer for such Service(s), or (c) termination by SFDC in its sole discretion. Additional trial terms and conditions may appear on the trial registration web page. Any such additional terms and conditions are incorporated into this Agreement by reference and are legally

binding.

ANY DATA CUSTOMER ENTERS INTO THE SERVICES, AND ANY CUSTOMIZATIONS MADE TO THE SERVICES BY OR FOR CUSTOMER, DURING CUSTOMER'S FREE TRIAL WILL BE PERMANENTLY LOST UNLESS CUSTOMER PURCHASES A SUBSCRIPTION TO THE SAME SERVICES AS THOSE COVERED BY THE TRIAL, PURCHASES APPLICABLE UPGRADED SERVICES, OR EXPORTS SUCH DATA, BEFORE THE END OF THE TRIAL PERIOD.  CUSTOMER CANNOT TRANSFER DATA ENTERED OR CUSTOMIZATIONS MADE DURING THE FREE TRIAL TO A SERVICE THAT WOULD BE A DOWNGRADE FROM THAT COVERED BY THE TRIAL (E.G., FROM ENTERPRISE EDITION TO PROFESSIONAL EDITION); THEREFORE, IF CUSTOMER PURCHASES A SERVICE THAT WOULD BE A DOWNGRADE FROM THAT COVERED BY THE TRIAL, CUSTOMER MUST EXPORT CUSTOMER DATA BEFORE THE END OF THE TRIAL PERIOD OR CUSTOMER DATA WILL BE PERMANENTLY LOST.

NOTWITHSTANDING THE "REPRESENTATIONS, WARRANTIES, EXCLUSIVE REMEDIES AND DISCLAIMERS" SECTION AND "INDEMNIFICATION BY SFDC" SECTION BELOW, DURING THE FREE TRIAL THE SERVICES ARE PROVIDED "AS-IS" WITHOUT ANY WARRANTY AND SFDC SHALL HAVE NO INDEMNIFICATION OBLIGATIONS NOR LIABILITY OF ANY TYPE WITH RESPECT TO THE SERVICES FOR THE FREE TRIAL PERIOD UNLESS SUCH EXCLUSION OF LIABILITY IS NOT ENFORCEABLE UNDER APPLICABLE LAW IN WHICH CASE SFDC'S LIABILITY WITH RESPECT TO THE SERVICES PROVIDED DURING THE FREE TRIAL SHALL NOT EXCEED $1,000.00.  WITHOUT LIMITING THE FOREGOING, SFDC AND ITS AFFILIATES AND ITS LICENSORS DO NOT REPRESENT OR WARRANT TO CUSTOMER THAT: (A) CUSTOMER'S USE OF THE SERVICES DURING THE FREE TRIAL PERIOD WILL MEET CUSTOMER'S REQUIREMENTS, (B) CUSTOMER'S USE OF THE SERVICES DURING THE FREE TRIAL PERIOD WILL BE UNINTERRUPTED, TIMELY, SECURE OR FREE FROM ERROR, AND (C) USAGE DATA PROVIDED DURING THE FREE TRIAL PERIOD WILL BE ACCURATE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE "LIMITATION OF LIABILITY" SECTION BELOW, CUSTOMER SHALL BE FULLY LIABLE UNDER THIS AGREEMENT TO SFDC AND ITS AFFILIATES FOR ANY DAMAGES ARISING OUT OF CUSTOMER'S USE OF THE SERVICES DURING THE FREE TRIAL PERIOD, ANY BREACH BY CUSTOMER OF THIS AGREEMENT AND ANY OF CUSTOMER'S INDEMNIFICATION OBLIGATIONS HEREUNDER.

CUSTOMER SHALL REVIEW THE APPLICABLE SERVICE'S DOCUMENTATION DURING THE TRIAL PERIOD TO BECOME FAMILIAR WITH THE FEATURES AND FUNCTIONS OF THE SERVICES BEFORE MAKING A PURCHASE.

2.6    **Free Services.**  SFDC may make Free Services available to Customer.  Use of Free Services is subject to the terms and conditions of this Agreement.  In the event of a conflict between this section and any other portion of this Agreement, this section shall control.  Free Services are provided to Customer without charge up to certain limits as described in the Documentation.  Usage over these limits requires Customer's purchase of additional resources or services.  Customer agrees that SFDC, in its sole discretion and for any or no reason, may terminate Customer's access to the Free Services or any part thereof.  Customer agrees that any termination of Customer's access to the Free Services may be without prior notice, and Customer agrees that SFDC will not be liable to Customer or any third party for such termination.  Customer is solely responsible for exporting Customer Data from the Free Services prior to termination of Customer's access to the Free Services for any reason, provided that if SFDC terminates Customer's account, except as required by law SFDC will provide Customer a reasonable opportunity to retrieve its Customer Data.

NOTWITHSTANDING THE "REPRESENTATIONS, WARRANTIES, EXCLUSIVE REMEDIES AND DISCLAIMERS" SECTION AND "INDEMNIFICATION BY SFDC" SECTION BELOW, THE FREE SERVICES ARE PROVIDED "AS-IS" WITHOUT ANY WARRANTY AND SFDC SHALL HAVE NO INDEMNIFICATION OBLIGATIONS NOR LIABILITY OF ANY TYPE WITH RESPECT TO THE FREE SERVICES UNLESS SUCH EXCLUSION OF LIABILITY IS NOT ENFORCEABLE UNDER APPLICABLE LAW IN WHICH CASE SFDC'S LIABILITY WITH RESPECT TO THE FREE SERVICES SHALL NOT EXCEED $1,000.00.  WITHOUT LIMITING THE FOREGOING, SFDC AND ITS AFFILIATES AND ITS LICENSORS DO NOT REPRESENT OR WARRANT TO CUSTOMER THAT: (A) CUSTOMER'S USE OF THE FREE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS, (B) CUSTOMER'S USE OF THE FREE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE OR FREE FROM ERROR, AND (C) USAGE DATA PROVIDED THROUGH THE FREE SERVICES WILL BE ACCURATE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE "LIMITATION OF LIABILITY" SECTION BELOW, CUSTOMER SHALL BE FULLY LIABLE UNDER THIS AGREEMENT TO SFDC AND ITS AFFILIATES FOR ANY DAMAGES ARISING OUT OF CUSTOMER'S USE OF THE FREE SERVICES, ANY BREACH BY CUSTOMER OF THIS AGREEMENT AND ANY OF CUSTOMER'S INDEMNIFICATION OBLIGATIONS HEREUNDER.

3.    **USE OF SERVICES AND CONTENT**

3.1    **Subscriptions.**  Unless otherwise provided in the applicable Order Form or Documentation, (a) Purchased Services and access to Content are purchased as subscriptions for the term stated in the applicable Order Form or in the applicable online purchasing portal, (b) subscriptions for Purchased Services may be added during a subscription term at the same pricing as the underlying subscription pricing, prorated for the portion of that subscription term remaining at the time the subscriptions are added, and (c) any added subscriptions will terminate on the same date as the underlying subscriptions.  Customer agrees that its purchases are

not contingent on the delivery of any future functionality or features, or dependent on any oral or written public comments made by SFDC regarding future functionality or features.

**3.2**     **Usage Limits.**   Services and Content are subject to usage limits specified in Order Forms and Documentation.  If Customer exceeds a contractual usage limit, SFDC may work with Customer to seek to reduce Customer's usage so that it conforms to that limit.  If, notwithstanding SFDC's efforts, Customer is unable or unwilling to abide by a contractual usage limit, Customer will execute an Order Form for additional quantities of the applicable Services or Content promptly upon SFDC's request, and/or pay any invoice for excess usage in accordance with the "Invoicing and Payment" section below.

**3.3**     **Customer Responsibilities.**   Customer will (a) be responsible for Users' compliance with this Agreement, Documentation and Order Forms, (b) be responsible for the accuracy, quality and legality of Customer Data, the means by which Customer acquired Customer Data, Customer's use of Customer Data with the Services, and the interoperation of any Non-SFDC Applications with which Customer uses Services or Content, (c) use commercially reasonable efforts to prevent unauthorized access to or use of Services and Content, and notify SFDC promptly of any such unauthorized access or use, (d) use Services and Content only in accordance with this Agreement, Documentation, the Acceptable Use and External Facing Services Policy at https://www.salesforce.com/company/legal/agreements.jsp, Order Forms and applicable laws and government regulations, and (e) comply with terms of service of any Non-SFDC Applications with which Customer uses Services or Content.  Any use of the Services in breach of the foregoing by Customer or Users that in SFDC's judgment threatens the security, integrity or availability of SFDC's services, may result in SFDC's immediate suspension of the Services, however SFDC will use commercially reasonable efforts under the circumstances to provide Customer with notice and an opportunity to remedy such violation or threat prior to any such suspension.

**3.4**     **Usage Restrictions.**   Customer will not (a) make any Service or Content available to anyone other than Customer or Users, or use any Service or Content for the benefit of anyone other than Customer or its Affiliates, unless expressly stated otherwise in an Order Form or the Documentation, (b) sell, resell, license, sublicense, distribute, make available, rent or lease any Service or Content, or include any Service or Content in a service bureau or outsourcing offering, (c) use a Service or Non-SFDC Application to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of third-party privacy rights, (d) use a Service or Non-SFDC Application to store or transmit Malicious Code, (e) interfere with or disrupt the integrity or performance of any Service or third-party data contained therein, (f) attempt to gain unauthorized access to any Service or Content or its related systems or networks, (g) permit direct or indirect access to or use of any Services or Content in a way that circumvents a contractual usage limit, or use any Services to access or use any of SFDC intellectual property except as permitted under this Agreement, an Order Form, or the Documentation, (h) modify, copy, or create derivative works based on a Service or any part, feature, function or user interface thereof, (i) copy Content except as permitted herein or in an Order Form or the Documentation, (j) frame or mirror any part of any Service or Content, other than framing on Customer's own intranets or otherwise for its own internal business purposes or as permitted in the Documentation, (k) except to the extent permitted by applicable law, disassemble, reverse engineer, or decompile a Service or Content or access it to (1) build a competitive product or service, (2) build a product or service using similar ideas, features, functions or graphics of the Service, (3) copy any ideas, features, functions or graphics of the Service, or (4) determine whether the Services are within the scope of any patent.

**3.5**     **Removal of Content and Non-SFDC Applications.**   If Customer receives notice that Content or a Non-SFDC Application must be removed, modified and/or disabled to avoid violating applicable law, third-party rights, or the Acceptable Use and External Facing Services Policy, Customer will promptly do so.  If Customer does not take required action in accordance with the above, or if in SFDC's judgment continued violation is likely to reoccur, SFDC may disable the applicable Content, Service and/or Non-SFDC Application.  If requested by SFDC, Customer shall confirm such deletion and discontinuance of use in writing and SFDC shall be authorized to provide a copy of such confirmation to any such third party claimant or governmental authority, as applicable.  In addition, if SFDC is required by any third party rights holder to remove Content, or receives information that Content provided to Customer may violate applicable law or third-party rights, SFDC may discontinue Customer's access to Content through the Services.

**4.**     **NON-SFDC PRODUCTS AND SERVICES**

**4.1**     **Non-SFDC Products and Services.**   SFDC or third parties may make available (for example, through a Marketplace or otherwise) third-party products or services, including, for example, Non-SFDC Applications and implementation and other consulting services.  Any acquisition by Customer of such products or services, and any exchange of data between Customer and any Non-SFDC provider, product or service is solely between Customer and the applicable Non-SFDC provider.  SFDC does not warrant or support Non-SFDC Applications or other Non-SFDC products or services, whether or not they are designated by SFDC as "certified" or otherwise, unless expressly provided otherwise in an Order Form.  SFDC is not responsible for any disclosure, modification or deletion of Customer Data resulting from access by such Non-SFDC Application or its provider.

**4.2**     **Integration with Non-SFDC Applications.**   The Services may contain features designed to interoperate with Non-SFDC Applications.  SFDC cannot guarantee the continued availability of such Service features, and may cease providing them without entitling Customer to any refund, credit, or other compensation, if for example and without limitation, the provider of a Non-SFDC Application ceases to make the Non-SFDC Application available for interoperation with the corresponding Service features

in a manner acceptable to SFDC.

**5.     FEES AND PAYMENT**

**5.1     Fees**.  Customer will pay all fees specified in Order Forms.  Except as otherwise specified herein or in an Order Form, (i) fees are based on Services and Content subscriptions purchased and not actual usage, (ii) payment obligations are non- cancelable and fees paid are non-refundable, and (iii) quantities purchased cannot be decreased during the relevant subscription term.

**5.2     Invoicing and Payment**.  Customer will provide SFDC with valid and updated credit card information, or with a valid purchase order or alternative document reasonably acceptable to SFDC.  If Customer provides credit card information to SFDC, Customer authorizes SFDC to charge such credit card for all Purchased Services listed in the Order Form for the initial subscription term and any renewal subscription term(s) as set forth in the "Term of Purchased Subscriptions" section below.  Such charges shall be made in advance, either annually or in accordance with any different billing frequency stated in the applicable Order Form.  If the Order Form specifies that payment will be by a method other than a credit card, SFDC will invoice Customer in advance and otherwise in accordance with the relevant Order Form.  Unless otherwise stated in the Order Form, invoiced fees are due net 30 days from the invoice date.  Customer is responsible for providing complete and accurate billing and contact information to SFDC and notifying SFDC of any changes to such information.

**5.3     Overdue Charges**.  If any invoiced amount is not received by SFDC by the due date, then without limiting SFDC's rights or remedies, (a) those charges may accrue late interest at the rate of 1.5% of the outstanding balance per month, or the maximum rate permitted by law, whichever is lower, and/or (b) SFDC may condition future subscription renewals and Order Forms on payment terms shorter than those specified in the "Invoicing and Payment" section above.

**5.4     Suspension of Service and Acceleration**.  If any charge owing by Customer under this or any other agreement for services is 30 days or more overdue, (or 10 or more days overdue in the case of amounts Customer has authorized SFDC to charge to Customer's credit card), SFDC may, without limiting its other rights and remedies, accelerate Customer's unpaid fee obligations under such agreements so that all such obligations become immediately due and payable, and suspend Services until such amounts are paid in full, provided that, other than for customers paying by credit card or direct debit whose payment has been declined, SFDC will give Customer at least 10 days' prior notice that its account is overdue, in accordance with the "Manner of Giving Notice" section below for billing notices, before suspending services to Customer.

**5.5     Payment Disputes**.  SFDC will not exercise its rights under the "Overdue Charges" or "Suspension of Service and Acceleration" section above if Customer is disputing the applicable charges reasonably and in good faith and is cooperating diligently to resolve the dispute.

**5.6     Taxes**.  SFDC's fees do not include any taxes, levies, duties or similar governmental assessments of any nature, including, for example, value-added, sales, use or withholding taxes, assessable by any jurisdiction whatsoever (collectively, "Taxes").  Customer is responsible for paying all Taxes associated with its purchases hereunder.  If SFDC has the legal obligation to pay or collect Taxes for which Customer is responsible under this section, SFDC will invoice Customer and Customer will pay that amount unless Customer provides SFDC with a valid tax exemption certificate authorized by the appropriate taxing authority.  For clarity, SFDC is solely responsible for taxes assessable against it based on its income, property and employees.

**6.     PROPRIETARY RIGHTS AND LICENSES**

**6.1     Reservation of Rights**.  Subject to the limited rights expressly granted hereunder, SFDC, its Affiliates, its licensors and Content Providers reserve all of their right, title and interest in and to the Services and Content, including all of their related intellectual property rights.  No rights are granted to Customer hereunder other than as expressly set forth herein.

**6.2     Access to and Use of Content**.  Customer has the right to access and use applicable Content subject to the terms of applicable Order Forms, this Agreement and the Documentation.

**6.3     License by Customer to SFDC**.  Customer grants SFDC, its Affiliates and applicable contractors a worldwide, limited-term license to host, copy, use, transmit, and display any Non-SFDC Applications and program code created by or for Customer using a Service or for use by Customer with the Services, and Customer Data, each as appropriate for SFDC to provide and ensure proper operation of the Services and associated systems in accordance with this Agreement.  If Customer chooses to use a Non-SFDC Application with a Service, Customer grants SFDC permission to allow the Non-SFDC Application and its provider to access Customer Data and information about Customer's usage of the Non-SFDC Application as appropriate for the interoperation of that Non-SFDC Application with the Service.  Subject to the limited licenses granted herein, SFDC acquires no right, title or interest from Customer or its licensors under this Agreement in or to any Customer Data, Non-SFDC Application or such program code.

**6.4     License by Customer to Use Feedback**.  Customer grants to SFDC and its Affiliates a worldwide, perpetual, irrevocable, royalty-free license to use and incorporate into its services any suggestion, enhancement request, recommendation, correction or other feedback provided by Customer or Users relating to the operation of SFDC's or its Affiliates' services.

**6.5     Federal Government End Use Provisions.**  SFDC provides the Services, including related software and technology, for ultimate federal government end use in accordance with the following: The Services consist of "commercial items," as defined at FAR

2.101.  In accordance with FAR 12.211-12.212 and DFARS 227.7102-4 and 227.7202-4, as applicable, the rights of the U.S. Government to use, modify, reproduce, release, perform, display, or disclose commercial computer software, commercial computer software documentation, and technical data furnished in connection with the Services shall be as provided in this Agreement, except that, for U.S. Department of Defense end users, technical data customarily provided to the public is furnished in accordance with DFARS 252.227-7015.  If a government agency needs additional rights, it must negotiate a mutually acceptable written addendum to this Agreement specifically granting those rights.

## 7.   CONFIDENTIALITY

**7.1**   **Definition of Confidential Information.**  "Confidential Information" means all information disclosed by a party ("Disclosing Party") to the other party ("Receiving Party"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure.  Confidential Information of Customer includes Customer Data; Confidential Information of SFDC includes the Services and Content, and the terms and conditions of this Agreement and all Order Forms (including pricing). Confidential Information of each party includes business and marketing plans, technology and technical information, product plans and designs, and business processes disclosed by such party.  However, Confidential Information does not include any information that (i) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party, (ii) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party, (iii) is received from a third party without breach of any obligation owed to the Disclosing Party, or (iv) was independently developed by the Receiving Party. For the avoidance of doubt, the non-disclosure obligations set forth in this "Confidentiality" section apply to Confidential Information exchanged between the parties in connection with the evaluation of additional SFDC services.

**7.2**   **Protection of Confidential Information**.  As between the parties, each party retains all ownership rights in and to its Confidential Information.  The Receiving Party will use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but not less than reasonable care) to (i) not use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement and (ii) except as otherwise authorized by the Disclosing Party in writing, limit access to Confidential Information of the Disclosing Party to those of its and its Affiliates' employees and contractors who need that access for purposes consistent with this Agreement and who have signed confidentiality agreements with the Receiving Party containing protections not materially less protective of the Confidential Information than those herein.  Neither party will disclose the terms of this Agreement or any Order Form to any third party other than its Affiliates, legal counsel and accountants without the other party's prior written consent, provided that a party that makes any such disclosure to its Affiliate, legal counsel or accountants will remain responsible for such Affiliate's, legal counsel's or accountant's compliance with this "Confidentiality" section.  Notwithstanding the foregoing, SFDC may disclose the terms of this Agreement and any applicable Order Form to a subcontractor or Non-SFDC Application Provider to the extent necessary to perform SFDC's obligations under this Agreement, under terms of confidentiality materially as protective as set forth herein.

**7.3**   **Compelled Disclosure.**  The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent compelled by law to do so, provided the Receiving Party gives the Disclosing Party prior notice of the compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure.  If the Receiving Party is compelled by law to disclose the Disclosing Party's Confidential Information as part of a civil proceeding to which the Disclosing Party is a party, and the Disclosing Party is not contesting the disclosure, the Disclosing Party will reimburse the Receiving Party for its reasonable cost of compiling and providing secure access to that Confidential Information.

## 8.   REPRESENTATIONS, WARRANTIES, EXCLUSIVE REMEDIES AND DISCLAIMERS

**8.1**   **Representations.**  Each party represents that it has validly entered into this Agreement and has the legal power to do so.

**8.2**   **SFDC Warranties.**  SFDC warrants that during an applicable subscription term (a) this Agreement, the Order Forms and the Documentation will accurately describe the applicable administrative, physical, and technical safeguards for protection of the security, confidentiality and integrity of Customer Data, (b) SFDC will not materially decrease the overall security of the Services, (c) the Services will perform materially in accordance with the applicable Documentation, and (d) subject to the "Integration with Non-SFDC Applications" section above, SFDC will not materially decrease the overall functionality of the Services.  For any breach of a warranty above, Customer's exclusive remedies are those described in the "Termination" and "Refund or Payment upon Termination" sections below.

**8.3**   **Disclaimers.**  EXCEPT AS EXPRESSLY PROVIDED HEREIN, NEITHER PARTY MAKES ANY WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, AND EACH PARTY SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.  CONTENT AND BETA SERVICES ARE PROVIDED "AS IS," AND AS AVAILABLE EXCLUSIVE OF ANY WARRANTY WHATSOEVER.

## 9.   MUTUAL INDEMNIFICATION

**9.1**   **Indemnification by SFDC.**  SFDC will defend Customer against any claim, demand, suit or proceeding made or brought against

Customer by a third party alleging that any Purchased Service infringes or misappropriates such third party's intellectual property rights (a "Claim Against **Customer**"), and will indemnify Customer from any damages, attorney fees and costs finally awarded against Customer as a result of, or for amounts paid by Customer under a settlement approved by SFDC in writing of, a Claim Against Customer, provided Customer (a) promptly gives SFDC written notice of the Claim Against Customer, (b) gives SFDC sole control of the defense and settlement of the Claim Against Customer (except that SFDC may not settle any Claim Against Customer unless it unconditionally releases Customer of all liability), and (c) gives SFDC all reasonable assistance, at SFDC's expense. If SFDC receives information about an infringement or misappropriation claim related to a Service, SFDC may in its discretion and at no cost to Customer (i) modify the Services so that they are no longer claimed to infringe or misappropriate, without breaching SFDC's warranties under "SFDC Warranties" above, (ii) obtain a license for Customer's continued use of that Service in accordance with this Agreement, or (iii) terminate Customer's subscriptions for that Service upon 30 days' written notice and refund Customer any prepaid fees covering the remainder of the term of the terminated subscriptions. The above defense and indemnification obligations do not apply if (1) the allegation does not state with specificity that the Services are the basis of the Claim Against Customer; (2) a Claim Against Customer arises from the use or combination of the Services or any part thereof with software, hardware, data, or processes not provided by SFDC, if the Services or use thereof would not infringe without such combination; (3) a Claim Against Customer arises from Services under an Order Form for which there is no charge; or (4) a Claim against Customer arises from Content, a Non-SFDC Application or Customer's breach of this Agreement, the Documentation or applicable Order Forms.

**9.2   Indemnification by Customer.**   Customer will defend SFDC and its Affiliates against any claim, demand, suit or proceeding made or brought against SFDC by a third party alleging (a) that any Customer Data or Customer's use of Customer Data with the Services, (b) a Non-SFDC Application provided by Customer, or (c) the combination of a Non-SFDC Application provided by Customer and used with the Services, infringes or misappropriates such third party's intellectual property rights, or arising from Customer's use of the Services or Content in an unlawful manner or in violation of the Agreement, the Documentation, or Order Form (each a "Claim Against **SFDC**"), and will indemnify SFDC from any damages, attorney fees and costs finally awarded against SFDC as a result of, or for any amounts paid by SFDC under a settlement approved by Customer in writing of, a Claim Against SFDC, provided SFDC (a) promptly gives Customer written notice of the Claim Against SFDC, (b) gives Customer sole control of the defense and settlement of the Claim Against SFDC (except that Customer may not settle any Claim Against SFDC unless it unconditionally releases SFDC of all liability), and (c) gives Customer all reasonable assistance, at Customer's expense. The above defense and indemnification obligations do not apply if a Claim Against SFDC arises from SFDC's breach of this Agreement, the Documentation or applicable Order Forms.

**9.3   Exclusive Remedy.**   This "Mutual Indemnification" section states the indemnifying party's sole liability to, and the indemnified party's exclusive remedy against, the other party for any third party claim described in this section.

## 10.   LIMITATION OF LIABILITY

**10.1   Limitation of Liability.**   IN NO EVENT SHALL THE AGGREGATE LIABILITY OF EACH PARTY TOGETHER WITH ALL OF ITS AFFILIATES ARISING OUT OF OR RELATED TO THIS AGREEMENT EXCEED THE TOTAL AMOUNT PAID BY CUSTOMER AND ITS AFFILIATES HEREUNDER FOR THE SERVICES GIVING RISE TO THE LIABILITY IN THE TWELVE MONTHS PRECEDING THE FIRST INCIDENT OUT OF WHICH THE LIABILITY AROSE. THE FOREGOING LIMITATION WILL APPLY WHETHER AN ACTION IS IN CONTRACT OR TORT AND REGARDLESS OF THE THEORY OF LIABILITY, BUT WILL NOT LIMIT CUSTOMER'S AND ITS AFFILIATES' PAYMENT OBLIGATIONS UNDER THE "FEES AND PAYMENT" SECTION ABOVE.

**10.2   Exclusion of Consequential and Related Damages.**   IN NO EVENT WILL EITHER PARTY OR ITS AFFILIATES HAVE ANY LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT FOR ANY LOST PROFITS, REVENUES, GOODWILL, OR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, COVER, BUSINESS INTERRUPTION OR PUNITIVE DAMAGES, WHETHER AN ACTION IS IN CONTRACT OR TORT AND REGARDLESS OF THE THEORY OF LIABILITY, EVEN IF A PARTY OR ITS AFFILIATES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR IF A PARTY'S OR ITS AFFILIATES' REMEDY OTHERWISE FAILS OF ITS ESSENTIAL PURPOSE. THE FOREGOING DISCLAIMER WILL NOT APPLY TO THE EXTENT PROHIBITED BY LAW.

## 11.   TERM AND TERMINATION

**11.1   Term of Agreement.**   This Agreement commences on the date Customer first accepts it and continues until all subscriptions hereunder have expired or have been terminated.

**11.2   Term of Purchased Subscriptions.**   The term of each subscription shall be as specified in the applicable Order Form. Except as otherwise specified in an Order Form, subscriptions will automatically renew for additional periods equal to the expiring subscription term or one year (whichever is shorter), unless either party gives the other written notice (email acceptable) at least 30 days before the end of the relevant subscription term. Except as expressly provided in the applicable Order Form, renewal of promotional or one-time priced subscriptions will be at SFDC's applicable list price in effect at the time of the applicable renewal. Notwithstanding anything to the contrary, any renewal in which subscription volume or subscription length for any Services has decreased from the prior term will result in re-pricing at renewal without regard to the prior term's per-unit pricing.

**11.3**  **Termination.**  A party may terminate this Agreement for cause (i) upon 30 days written notice to the other party of a material breach if such breach remains uncured at the expiration of such period, or (ii) if the other party becomes the subject of a petition in bankruptcy or any other proceeding relating to insolvency, receivership, liquidation or assignment for the benefit of creditors.

**11.4**  **Refund or Payment upon Termination.**  If this Agreement is terminated by Customer in accordance with the "Termination" section above, SFDC will refund Customer any prepaid fees covering the remainder of the term of all Order Forms after the effective date of termination.  If this Agreement is terminated by SFDC in accordance with the "Termination" section above, Customer will pay any unpaid fees covering the remainder of the term of all Order Forms to the extent permitted by applicable law.  In no event will termination relieve Customer of its obligation to pay any fees payable to SFDC for the period prior to the effective date of termination.

**11.5**  **Surviving Provisions.**   The sections titled "Free Services," "Fees and Payment," "Proprietary Rights and Licenses," "Confidentiality," "Disclaimers," "Mutual Indemnification," "Limitation of Liability," "Refund or Payment upon Termination," "Removal of Content and Non-SFDC Applications," "Surviving Provisions" and "General Provisions" will survive any termination or expiration of this Agreement, and the section titled "Protection of Customer Data" will survive any termination or expiration of this Agreement for so long as SFDC retains possession of Customer Data.

**12.**   **GENERAL PROVISIONS**

**12.1**  **Export Compliance.**  The Services, Content, other SFDC technology, and derivatives thereof may be subject to export laws and regulations of the United States and other jurisdictions.  SFDC and Customer each represents that it is not named on any U.S. government denied-party list.  Customer will not permit any User to access or use any Service or Content in a U.S.-embargoed country or region (currently Cuba, Iran, North Korea, Sudan, Syria or Crimea) or in violation of any U.S.  export law or regulation.

**12.2**  **Anti-Corruption.**  Neither party has received or been offered any illegal or improper bribe, kickback, payment, gift, or thing of value from an employee or agent of the other party in connection with this Agreement.   Reasonable gifts and entertainment provided in the ordinary course of business do not violate the above restriction.

**12.3**  **Entire Agreement and Order of Precedence.**  This Agreement is the entire agreement between SFDC and Customer regarding Customer's use of Services and Content and supersedes all prior and contemporaneous agreements, proposals or representations, written or oral, concerning its subject matter.  The parties agree that any term or condition stated in a Customer purchase order or in any other Customer order documentation (excluding Order Forms) is void.  In the event of any conflict or inconsistency among the following documents, the order of precedence shall be: (1) the applicable Order Form, (2) this Agreement, and (3) the Documentation.  Titles and headings of sections of this Agreement are for convenience only and shall not affect the construction of any provision of this Agreement.

**12.4**  **Relationship of the Parties.**  The parties are independent contractors.  This Agreement does not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties. Each party will be solely responsible for payment of all compensation owed to its employees, as well as all employment-related taxes.

**12.5**  **Third-Party Beneficiaries.**  There are no third-party beneficiaries under this Agreement.

**12.6**  **Waiver**.  No failure or delay by either party in exercising any right under this Agreement will constitute a waiver of that right.

**12.7**  **Severability.**  If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision will be deemed null and void, and the remaining provisions of this Agreement will remain in effect.

**12.8**  **Assignment**.  Neither party may assign any of its rights or obligations hereunder, whether by operation of law or otherwise, without the other party's prior written consent (not to be unreasonably withheld); provided, however, either party may assign this Agreement in its entirety (including all Order Forms), without the other party's consent to its Affiliate or in connection with a merger, acquisition, corporate reorganization, or sale of all or substantially all of its assets.  Notwithstanding the foregoing, if a party is acquired by, sells substantially all of its assets to, or undergoes a change of control in favor of, a direct competitor of the other party, then such other party may terminate this Agreement upon written notice.  In the event of such a termination, SFDC will refund Customer any prepaid fees covering the remainder of the term of all subscriptions for the period after the effective date of such termination.  Subject to the foregoing, this Agreement will bind and inure to the benefit of the parties, their respective successors and permitted assigns.

**12.9**  **SFDC Contracting Entity, Notices, Governing Law, and Venue.**  The SFDC entity entering into this Agreement, the address to which Customer should direct notices under this Agreement, the law that will apply in any dispute or lawsuit arising out of or in connection with this Agreement, and the courts that have jurisdiction over any such dispute or lawsuit, depend on where Customer is domiciled.

| If Customer is domiciled in: | The SFDC entity entering into this Agreement is: | Notices should be addressed to: | Governing law is: | Courts with exclusive jurisdiction are: |
|---|---|---|---|---|
| The United States of America, Mexico or a Country in Central or South America or the Caribbean | salesforce.com, inc., a Delaware corporation | Salesforce Tower, 415 Mission Street, 3rd Floor, San Francisco, California, 94105, U.S.A., attn: VP, Worldwide Sales Operations, with a copy to attn: General Counsel. | California and controlling United States federal law | San Francisco, California, U.S.A. |
| Canada | salesforce.com Canada Corporation, a Nova Scotia corporation | Salesforce Tower, 415 Mission Street, 3rd Floor, San Francisco, California, 94105, U.S.A., attn: VP, Worldwide Sales Operations, with a copy to attn: General Counsel. | Ontario and controlling Canadian federal law | Toronto, Ontario, Canada |
| France | salesforce.com France, a French S.A.S company with a share capital of 37,000 €, registered with the Paris Trade Registry under number 483 993 226 RCS Paris, Registered office: 3 Avenue Octave Gréard, 75007 Paris, France | Salesforce.com Sarl, Route de la Longeraie 9, Morges, 1110, Switzerland, attn: Director, EMEA Sales Operations, with a copy to attn.: Legal Department - Service Juridique, 3 Avenue Octave Gréard, 75007 Paris, France. | France | Paris, France |
| Germany | salesforce.com Germany GmbH, a limited liability company, incorporated in Germany | Salesforce.com Sarl, Route de la Longeraie 9, Morges, 1110, Switzerland, attn: Director, EMEA Sales Operations, with a copy to attn.: Legal Department - Erika-Mann-Strasse 31-37, 80636 München, Germany. | Germany | Munich, Germany |
| Italy | Salesforce.com Italy S.r.l., an Italian limited liability company having its registered address at Piazza Filippo Meda 5, 20121 Milan (MI), VAT / Fiscal code n. 04959160963 | Salesforce.com Sarl, Route de la Longeraie 9, Morges, 1110, Switzerland, attn: Director, EMEA Sales Operations, with a copy to attn.: Legal Department | Italy | Milan, Italy |
| Spain | Salesforce Systems Spain, S.L.U., a limited liability incorporated in Spain | Salesforce.com Sarl, Route de la Longeraie 9, Morges, 1110, Switzerland, attn: Director, EMEA Sales Operations, with a copy to attn.: Legal Department - Paseo de la Castellana 79, Madrid, 28046, Spain | Spain | Madrid, Spain |
| United Kingdom | Salesforce UK Limited (f/k/a salesforce.com EMEA Limited), a limited liability company incorporated in England | Salesforce.com Sarl, Route de la Longeraie 9, Morges, 1110, Switzerland, attn: Director, EMEA Sales Operations, with a copy to attn: Legal Department, Salesforce UK Limited (f/k/a salesforce.com EMEA Limited), Floor 26 Salesforce Tower, 110 Bishopsgate, London, EC2N 4AY, United Kingdom. | England | London, England |

| A Country in Europe, the Middle East or Africa, other than France, Germany, Italy, Spain, and the United Kingdom | SFDC Ireland Limited, a limited liability company incorporated in Ireland | Salesforce.com Sarl, Route de la Longeraie 9, Morges, 1110, Switzerland, attn: Director, EMEA Sales Operations, with a copy to attn.: Legal Department - 3rd and 4th Floor, 1 Central Park Block G, Central Park, Leopardstown, Dublin 18, Ireland | England | London, England |
|---|---|---|---|---|
| Japan | Kabushiki Kaisha Salesforce.com, a Japan corporation | JP Tower 12F, 2-7-2 Marunouchi, Chiyoda-ku, Tokyo 100-7012, Japan, attn: Senior Director, Japan Sales Operations, with a copy to attn: General Counsel. | Japan | Tokyo, Japan |
| A Country in Asia or the Pacific region, other than Japan, Australia or New Zealand | Salesforce.com Singapore Pte Ltd, a Singapore private limited company | 5 Temasek Boulevard #13-01, Suntec Tower 5, Singapore, 038985, attn: Director, APAC Sales Operations, with a copy to attn: General Counsel. | Singapore | Singapore |
| Australia or New Zealand | SFDC Australia Pty Ltd | 201 Sussex Street, Darling Park Tower 3, Level 12, Sydney NSW 2000, attn: Senior Director, Finance with a copy to attn: General Counsel. | New South Wales, Australia | New South Wales, Australia |

**12.10 Manner of Giving Notice.** Except as otherwise specified in this Agreement, all notices related to this Agreement will be in writing and will be effective upon (a) personal delivery, (b) the second business day after mailing, or (c), except for notices of termination or an indemnifiable claim ("Legal Notices"), which shall clearly be identifiable as Legal Notices, the day of sending by email. Billing-related notices to Customer will be addressed to the relevant billing contact designated by Customer. All other notices to Customer will be addressed to the relevant Services system administrator designated by Customer.

**12.11 Agreement to Governing Law and Jurisdiction.** Each party agrees to the applicable governing law above without regard to choice or conflicts of law rules, and to the exclusive jurisdiction of the applicable courts above.

**12.12 Local Law Requirements: France.** With respect to Customers domiciled in France, in the event of any conflict between any statutory law in France applicable to Customer, and the terms and conditions of this Agreement, the applicable statutory law shall prevail.

**12.13 Local Law Requirements: Germany.** With respect to Customers domiciled in Germany, Section 8 "REPRESENTATIONS, WARRANTIES, EXCLUSIVE REMEDIES AND DISCLAIMERS", Section 9.3 "Exclusive Remedy", and Section 10 "LIMITATION OF LIABILITY" of this Agreement are replaced with the following sections respectively:

**8 WARRANTIES FOR CUSTOMERS DOMICILED IN GERMANY**

**8.1 Agreed Quality of the Services**. SFDC warrants that during an applicable subscription term (a) this Agreement, the Order Forms and the Documentation will accurately describe the applicable administrative, physical, and technical safeguards for protection of the security, confidentiality and integrity of Customer Data, (b) SFDC will not materially decrease the overall security of the Services, (c) the Services will perform materially in accordance with the applicable Documentation, and (d) subject to the "Integration with Non-SFDC Applications" section above, SFDC will not materially decrease the overall functionality of the Services.

**8.2 Content**. SFDC is not designating or adopting Content as its own and assumes no warranty or liability for Content. The parties agree that the "Reporting of Defects", "Remedies resulting from Defects" and "Exclusions" section shall apply accordingly to SFDC's responsibility in the event SFDC is deemed responsible for Content by a court of competent jurisdiction.

**8.3 Reporting of Defects**. Customer shall report any deviation of the Services from the "Agreed Quality of the Services" section ("Defect") to SFDC in writing without undue delay and shall submit a detailed description of the Defect or, if not possible, of the symptoms of the Defect. Customer shall forward to SFDC any useful information available to Customer for rectification of the Defect.

**8.4 Remedies resulting from Defects**. SFDC shall rectify any Defect within a reasonable period of time. If such rectification fails, Customer may terminate the respective Order Form provided that SFDC had enough time for curing the Defect. The "Refund or Payment upon Termination" section, sentence and 1 and sentence 3 shall apply accordingly. If SFDC is responsible for the Defect or if SFDC is in default with the rectification, Customer may assert claims for the damage caused in the scope specified

in the "Limitation of Liability" section below.

**8.5 Defects in Title**. Defects in title of the Services shall be handled in accordance with the provisions of Clause 9 "Mutual Indemnification".

**8.6 Exclusions**. Customer shall have no claims under this Clause 8 "Warranty" if a Defect was caused by the Services not being used by Customer in accordance with the provisions of this Agreement, the Documentation and the applicable Order Forms.

**9.3 Liability resulting from Indemnification for Customers domiciled in Germany**. The below "Limitation of Liability" section shall apply to any claims resulting from this "Mutual Indemnification" section.

## 10. LIMITATION OF LIABILITY FOR CUSTOMERS DOMICILED IN GERMANY

**10.1 Unlimited Liability.** The Parties shall be mutually liable without limitation
- (a) in the event of willful misconduct or gross negligence,
- (b) within the scope of a guarantee taken over by the respective party,
- (c) in the event that a defect is maliciously concealed,
- (d) in case of an injury to life, body or health,
- (e) according to the German Product Liability Law.

**10.2 Liability for Breach of Cardinal Duties**. If cardinal duties are infringed due to slight negligence and if, as a consequence, the achievement of the objective of this Agreement including any applicable Order Form is endangered, or in the case of a slightly negligent failure to comply with duties, the very discharge of which is an essential prerequisite for the proper performance of this Agreement (including any applicable Order Form), the parties' liability shall be limited to foreseeable damage typical for the contract. In all other respects, any liability for damage caused by slight negligence shall be excluded.

**10.3 Liability Cap.** Unless the parties are liable in accordance with "Unlimited Liability" section above, in no event shall the aggregate liability of each party together with all of its Affiliates arising out of or related to this Agreement exceed the total amount paid by Customer and its Affiliates hereunder for the Services giving rise to the liability in the 12 months preceding the first incident out of which the liability arose. The foregoing limitation will not limit Customer's and its Affiliates' payment obligations under the "Fees and Payment" section above.

**10.4 Scope.** With the exception of liability in accordance with the "Unlimited Liability" section, the above limitations of liability shall apply to all claims for damages, irrespective of the legal basis including claims for tort damages. The above limitations of liability also apply in the case of claims for a party's damages against the respective other party's employees, agents or bodies.

**12.14 Local Law Requirements: Italy.** With respect to Customers domiciled in Italy, Section 5.2 "Invoicing and Payment", Section 5.3 "Overdue Charges", Section 5.4 "Suspension of Service and Acceleration", and Section 12.2 "Anti Corruption" of this Agreement are replaced with the following sections respectively:

### 5.2. Invoicing and Payment

**5.2.1 Invoicing and Payment.** Fees will be invoiced in advance and otherwise in accordance with the relevant Order Form. Unless otherwise stated in the Order Form, fees are due net 30 days from the invoice date. The parties acknowledge that invoices are also be submitted electronically by SFDC in accordance with the "Electronic Invoicing" section below through the Agenzia delle Entrate's Exchange System (SDI – Sistema di Interscambio) and any delay due to the SDI shall not affect the foregoing payment term. Customer shall be responsible for providing complete and accurate billing and contact information to SFDC and shall notify SFDC of any changes to such information.

**5.2.2 Electronic Invoicing**. The invoice will be issued in electronic format as defined in article 1, paragraph 916, of Law no. 205 of December 27, 2017, which introduced the obligation of electronic invoicing, starting from January 1, 2019, for the sale of goods and services performed between residents, established or identified in the territory of the Italian State. To facilitate such electronic invoicing, Customer shall provide to SFDC at least the following information in writing: Customer full registered company name, registered office address, VAT number, tax/fiscal code and any additional code and/or relevant information required under applicable law. In any event, the parties shall cooperate diligently to enable such electronic invoicing process. Any error due to the provision by Customer of incorrect or insufficient invoicing information preventing (a) SFDC to successfully submit the electronic invoice to the SDI or (b) the SDI to duly and effectively process such invoice or (c) which, in any event, requires SFDC to issue an invoice again, shall not result in an extension of the payment term set out in the "Invoicing and Payment" section above, and such term shall still be calculated from the date of the original invoice. SFDC reserves the right to provide any invoice copy in electronic form via email in addition to the electronic invoicing described herein.

**5.2.3 Split Payment.** If subject to the "split payment" regime, Customer shall be exclusively responsible for payment of any VAT amount due, provided that Customer shall confirm to SFDC the applicability of such regime and, if applicable, Customer shall provide proof of such VAT payment to SFDC and, if applicable, Customer shall provide proof of such VAT payment to SFDC.

**5.3 Overdue Charges.** Subject to the "Payment Disputes" section below, if any invoiced amount is not received by SFDC by the due date, then without limiting SFDC's rights or remedies, those charges, without the need for notice of default, may accrue late interest at the rate of 1.5% of the outstanding balance per month, or the maximum rate permitted by law (Legislative Decree no. 231/2002), whichever is lower and/or (b) SFDC may condition future subscription renewals and Order Forms on payment terms shorter than those specified in the "Invoicing and Payment" section above.

**5.4. Suspension of Service.** Subject to the "Payment Disputes" section below, if any charge owing by Customer under this or any other agreement for services is 30 days or more overdue, (or 10 or more days overdue in the case of amounts Customer has authorized SFDC to charge to Customer's credit card), SFDC may, without limiting its other rights and remedies, suspend Services until such amounts are paid in full, provided that, other than for customers paying by credit card or direct debit whose payment has been declined, SFDC will give Customer at least 10 days' prior notice that its account is overdue, in accordance with the "Manner of Giving Notice" section below for billing notices, before suspending services to Customer.

**12.2 Anti-Corruption.**

**12.2.1 Anti-Corruption.** Neither party has received or been offered any illegal or improper bribe, kickback, payment, gift, or thing of value from an employee or agent of the other party in connection with this Agreement. Reasonable gifts and entertainment provided in the ordinary course of business do not violate the above restriction.

**12.2.2 Code of Conduct and Organization, Management and Control Model.** Customer acknowledges that SFDC has adopted an Organization, Management and Control Model pursuant to Legislative Decree 231/2001 to prevent crimes provided for therein and commits to comply with the principles contained in the above Legislative Decree 231/2001 and in the SFDC Code of Conduct which is available at the following link: https://www.salesforce.com/content/dam/web/en_us/www/documents/legal/compliance%20documents/salesforce-code-of-conduct.pdf. Customer also acknowledges and agrees that the violation of the principles and the provisions contained in Legislative Decree 231/2001 and in the SFDC Code of Conduct by Customer may entitle SFDC, based on the severity of the violation, to terminate this Agreement for cause as set out in Section 11.3(i) above.

**12.15 Local Law Requirements: Spain.** With respect to Customers domiciled in Spain, in the event of any conflict between any statutory law in Spain applicable to Customer, and the terms and conditions of this Agreement, the applicable statutory law shall prevail.



salesforce.com, inc.
Salesforce Tower
415 Mission Street, 3rd Floor
San Francisco, CA 94105
United States

ORDER FORM for Doctors Studio
Offer Valid Through: 12/31/2019
Proposed by:Anna Jones
Quote Number: Q-03178884

# ORDER FORM

## Address Information

Bill To:
2595 NW Boca Raton Blvd. Suite 200A
Boca Raton
FL, 33431
US - United States

Ship To:
2595 NW Boca Raton Blvd. Suite 200A
Boca Raton
FL, 33431
US - United States

Billing Company Name: Doctors Studio
Billing Contact Name: Heidi Schulte
Billing Email Address: heidi@doctorsstudio.com

Billing Phone: (561) 444-7751
Billing Fax:
Billing Language: English

## Terms and Conditions

Contract Start Date*: 12/16/2019
Contract End Date*: 12/15/2020
Billing Frequency: Quarterly

Payment Method: Check
Payment Terms: Net 30
Billing Method: Email

## Services

| Services | Order Start Date* | Order End Date* | Order Term (months)* | Quantity |
|---|---|---|---|---|
| ExactTarget - Pro Edition | 12/16/2019 | 12/15/2020 | 12 | 1 |
| Journey Builder (Professional) | 12/16/2019 | 12/15/2020 | 12 | 1 |
| Prmr Success Plan - ExactTarget | 12/16/2019 | 12/15/2020 | 12 | 1 |
| Journey Builder Contacts (1,000) | 12/16/2019 | 12/15/2020 | 12 | 15 |
| | | | | Total: USD 10,080.00 |

*If this Order Form is executed and/or returned to salesforce.com by Customer after the Order Start Date above, salesforce.com may adjust the Order Start Date and Order End Date, without increasing the Total Price, based on the date salesforce.com activates the products and provided that the total term length does not change. Following activation, any adjustments to such Order Start Date and Order End Date may be confirmed by logging into Checkout, by reference to the order confirmation email sent by salesforce.com to the Billing Email Address above, and/or by contacting Customer Service.

**The Monthly/Unit Price shown above has been rounded to two decimal places for display purposes. As many as eight decimal places may be present in the actual price. The totals for this order were calculated using the actual price, rather than the Monthly/Unit Price displayed above, and are the true and binding totals for this order

Prices shown above do not include any taxes that may apply. Any such taxes are the responsibility of Customer. This is not an invoice.

For customers based in the United States, any applicable taxes will be determined based on the laws and regulations of the taxing authority(ies) governing the "Ship To" location provided by Customer on this Order Form.

## Usage Details

| Usage Type | Start Date | End Date | Quantity | Overage Rate |
|---|---|---|---|---|
| Super Messages | 12/16/2019 | 12/15/2020 | 2,500,000 | USD 0.00500000 |
| Pro Edition Contacts | 12/16/2019 | 12/15/2020 | 15,000 | USD 0.00750000 |

## Quote Special Terms

During the Contract Term and for two years thereafter, Customer shall not disclose the pricing or terms hereunder to any third party without salesforce.com's prior written consent. Customer shall safeguard all such information with the same or greater degree of care as it uses to safeguard its own confidential or proprietary information (but no less than reasonable care). Customer shall, upon becoming aware of any unauthorized disclosure of such information, promptly notify salesforce.com of, and provide reasonable assistance to salesforce.com in remedying, such disclosure.

## Product Special Terms

**NOTICE - Utilization**

Utilization units must be used before the End Date set forth in the Usage Details table herein – no rollover will be permitted. Usage fees do not include taxes or overage fees. Customer will be invoiced for any applicable taxes or overage fees as set forth in the Agreement and this Order Form. Usage will be calculated based on Central Standard Time. Additional units may be purchased at any time during the term of this Order Form; however, if Customer fails to order additional units prior to exhausting its then-current unit volume, the applicable overage rates for such units as set forth in this Order Form will apply. Overage fees will be billed monthly, in arrears.

**NOTICE - Marketing Cloud Einstein**

Customer acknowledges that SFDC may access Customer Data submitted to services and features branded as Einstein for the purpose of training and improving similar or related services and features, and Customer instructs SFDC to process its Customer Data for such purpose. SFDC retains all right, title, and interest in and to all system performance data, machine learning algorithms, and aggregated results of such machine learning. SFDC will not share Customer's Customer Data with any other customers.

**ExactTarget - Pro Edition**

Includes the following ExactTarget Services: 2,500,000 Super Messages per annum, 15,000 Contacts, and up to 15 users. In addition, the following Predictive Intelligence Services are included in this Edition: Intelligent Email (Predictive Email Content), and Web & Mobile Analytics. Additional information on features included in Pro Edition can be found at: http://sfdc.co/ETMCpricing. The following "NOTICES" terms apply: Email Messaging, Marketing Cloud Einstein, Predictive Intelligence, Contacts, and Utilization. The purchase of Professional Services is recommended for optimal implementation of Predictive Email Content. Implementation of Predictive Email Content is not required for use of other features within the Pro Edition.

**Journey Builder**

The purchase of Professional Services is recommended for optimal implementation of Journey Builder.

**NOTICE – Email Messaging**

The Marketing Cloud Trust and Compliance Documentation at https://help.Salesforce.com/articleView?id=Marketing-Cloud-Trust-and-Compliance-Documentation&language=en_US&type=1 as applicable to ExactTarget applies with respect to use of these Services.

**NOTICE - Predictive Intelligence**

Predictive Intelligence is provided using technology infrastructure different from that used by the ExactTarget Services comprising the Marketing Cloud Bundle. As a result, any representations, warranties and covenants regarding the service levels, support, privacy, security, or disaster recovery measures of other ExactTarget Services in the bundle are hereby disclaimed with respect to Predictive Intelligence and otherwise replaced by the information described in the applicable Trust and Compliance Documentation.

**NOTICE - Contacts**

Contacts must be used before the End Date set forth in the Usage Details table herein – no rollover will be permitted. Usage fees do not include taxes or overage fees. Customer will be invoiced for any applicable taxes or overage fees as set forth in the Agreement and this Order Form. Usage will be calculated based on Central Standard Time. Additional units may be purchased at any time during the term of this Order Form; however, if Customer fails to order additional units prior to exhausting its then-current unit volume, the applicable overage rates for such units as set forth in this Order Form will apply. Overage fees will be billed monthly, in arrears, for each month that Customer exceeds its then-current volume.

# Purchase Order Information

Is a Purchase Order (PO) required for the purchase or payment of the products on this Order Form? (Customer to complete)

[   X   ] No

[      ] Yes - Please complete below

PO Number: _____

PO Amount: _____

Upon signature by Customer and submission to salesforce.com, this Order Form shall become legally binding unless this Order Form is rejected by salesforce.com for any of the following reasons: (1) the signatory below does not have the authority to bind Customer to this Order Form, (2) changes have been made to this Order Form (other than completion of the purchase order information and the signature block), or (3) the requested purchase order information or signature is incomplete or does not match our records or the rest of this Order Form. Subscriptions are non-cancelable before their Order End Date.

This Order Form is governed by the terms of the salesforce.com Master Subscription Agreement found at https://www.salesforce.com/company/msa.jsp, unless (i) Customer has a written master subscription agreement executed by salesforce.com for such Services as referenced in the Documentation, in which case such written salesforce.com master subscription agreement will govern or (ii) otherwise set forth herein.

Customer Docu's Signed by:

Signature _____
        _Lisbeth W. Roy_
        1C55D76848B947F...

Name   Lisbeth Roy, DO

Business Title   Owner

Authority Level   C Level Executive

Date   December 23, 2019 | 14:09 PST

Confidential and proprietary. © Copyright 2000-2017 salesforce.com, inc. All rights reserved.



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 70ACFAE4E2424BFFBF55EADE264A52BD | | Status: Completed |
| Subject: Signature Requested: Order Form 1 of 2 Q-03178884 from salesforce.com | | |
| entityId: aJS0M000001Os8QWAS | | |
| requestType: Proposal | | |
| Source Envelope: | | |
| Document Pages: 4 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 3 | Initials: 0 | Salesforce |
| AutoNav: Enabled | | One Market street |
| EnvelopeId Stamping: Enabled | | San Francisco, CA  94105 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | noreply_sfdc@salesforce.com |
| | | IP Address: 136.147.46.8 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Salesforce | Location: DocuSign |
| 12/23/2019 1:33:31 PM | noreply_sfdc@salesforce.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Lisbeth Roy, DO | DocuSigned by: *Julia W. Roy* 1C5ED75848B847F... | Sent: 12/23/2019 1:33:31 PM |
| drroy@doctorsstudio.com | | Viewed: 12/23/2019 2:09:20 PM |
| CEO | | Signed: 12/23/2019 2:09:44 PM |
| Doctors Studio | | |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Uploaded Signature Image Using IP Address: 45.74.94.151 | |
| **Electronic Record and Signature Disclosure:** Accepted: 12/23/2019 2:05:22 PM ID: 90e4645f-1847-4e59-b13a-cb7e0e355309 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| sandra@doctorsstudio.com | COPIED | Sent: 12/23/2019 1:33:32 PM |
| sandra@doctorsstudio.com | | Viewed: 12/23/2019 2:09:36 PM |
| Security Level: Email, Account Authentication (None) | | |
| **Electronic Record and Signature Disclosure:** Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/23/2019 1:33:32 PM |
| Certified Delivered | Security Checked | 12/23/2019 2:09:21 PM |
| Signing Complete | Security Checked | 12/23/2019 2:09:44 PM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Completed | Security Checked | 12/23/2019 2:09:44 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

**Acknowledgement**

I agree not to challenge the validity, enforceability or admissibility of this signature process on the grounds that it is in an electronic form. By electronically signing an agreement with salesforce.com, I represent that I am authorized to bind the company or organization for which I am signing.